This is 23-5-0-1-0. Thank you. Dean Sandiford from the Federal Defender's Office. I'm here for Raul Hernandez-Moreno. The issue in this case is whether the district court plainly erred in allowing Detective Ward to effectively testify that he believed the co-defendant's account over Mr. Moreno's. In assessing this question, it's important to look at the testimony we challenge as a whole. So with respect to the co-defendant Hughes' statements, the detective conveyed that he generally believed her story and specifically believed her denial that they used a BB gun. And here's why. The first thing he said about her statement was that she gave partial truths. That's an explicit opinion on the truthfulness of her account, that some of what she said was true and some of what she said was false. He then immediately goes on to explain what he meant by that. And he says on the one hand, she gave him a good general idea of what actually occurred. And on the other hand, she minimized her own involvement. So essentially what he's telling the jury is I mostly believed her story, but she minimized her own participation in the robberies. Then just a short time later, the prosecution zeros in on the BB gun, which was the critical dispute at the trial. They had the detective testify that Hughes had said that there was no BB gun. And then the prosecutor asks, did he have any concerns after speaking with her that a BB gun had been used? Can I? I'm sorry to interrupt you so early, Mr. Sandefur. But when the officer said, or when there was testimony from the officer that these were pretty solid accounts, that was the initial interview. And at that initial interview, there was nothing about the BB gun, correct? Well, we don't know exactly what was said in the initial interview. Well, we kind of do. And that's for a couple of reasons. So first, Hughes had already testified, and she testified that her trial testimony was the same as her statement, except that she was admitting more fully her participation in the robbery. So in her trial testimony, of course, was that they had used the BB gun. Second, you know, this entire trial... Don't you need to nail that down in order to establish error here? No, I don't think so. And for a couple of reasons. I think one is just the detective testifying that he generally believes her, that he generally believes she was telling the truth, is vouching for her credibility in a general way. And then when you... Yeah, but about what is the point? Well, about the story that she gave. Just general, the general story, nothing about the BB gun. Well, there's nothing explicit about the BB gun at that point. But isn't that important? I don't think it is important because for a couple of reasons. One is that just a few transcript pages later, they do zero in on the BB gun. And he says he didn't have any concerns that a BB gun was used after her denial of the BB gun. So the way that testimony unfolds is, did she deny or did she... What was her testimony about the BB gun? She said there wasn't a BB gun on that day. After hearing from her, did you have any concerns that there was a BB gun? No, I didn't. So that is explicitly about the BB gun. It's a direct question about the BB gun. And all of this testimony that we're talking about spans just a few pages of transcript. And we're again at plain error here, right? We are at plain error, right. And so on plainness, well, one, the rule of law here is plain. That no witness can testify that they believe another witness's account, whether it's a lay witness, expert witness, it's forbidden. Well, and I don't want to pick on you, Mr. Sandberg, but it's sort of like qualified immunity. We really don't look for the obviousness of the error based on the clarity of the generic proposition of law. We really have to laser in on this specific colloquy to see, right, under Jones and Charlie Wright. Yes, absolutely. That's the case. But I think it does clearly implicate it for a few reasons, some of which we've already talked about. I mean, the first thing he says is that she told partial truths. So that's very explicit. That's saying she told me things that were true. She told me things that were false. And when he explains that, what he means is she generally told, I generally believed her. I thought that she gave me an accurate accounting of what happened, except that she minimized her own involvement. So right from the get-go, he's saying, I spoke to her. She told me her story, and I generally believed it. I think that's just as clear as it was in Jones. And then, you know, just, again, just a few pages later in the transcript. Jones was a little more specific than that. Jones was more specific in the sense that the question was— Mother said, I believe my daughters. That's true, but I think that maybe it's more direct in that sense, but it's just as explicit here because he's talking in terms of truth. He's saying she gave me partial truths. And there's only one way to understand that, is that he believed some of it, didn't believe other parts, and then he explains what he did believe and what he didn't believe. And then if you jump just a few transcript pages up, zeroing in on the BB gun in particular, we know that she said to him, there was no BB gun. And then he's asked, did you have any concerns after talking to her that there was a BB gun? And he says, no. There's no other way to understand that except that he's telling the jury, I believed her. Because if he hadn't, he would have had concerns. He believed her on a specific instance. On a specific day, she told him the truth. On another day, she wasn't. Well, so I think that— That's how I kind of gathered. Well, he does say that she told partial truths the first time, but what he identifies as the partial untruth is her minimizing her own involvement. And she testifies to this, too, and says, you know, yeah, I dumped it all on everybody else. I didn't take personal responsibility, but I explained how the robbery happened. That's the part of her story that changes, is that she implicates herself. There's no indication that any other part of the story had been any different. Do we even need her testimony? Hughes's testimony? Yes, absolutely, because she's the only witness who testifies that they used the real gun. She's the only person with firsthand knowledge who testifies at the trial that they used a real gun. And this was a significant— Oroglio said they used my gun. Oroglio— He did not testify, I know. He said, I had this gun, and they used this gun in both carjackings. That's not quite accurate. What the detective testifies that Oroglio says is that the gun that they found matched the description of his gun. We don't know what that means. There was no follow-up to any of this. That could just as easily be a denial. They said, well, it wasn't my gun, but it looked like my gun. That's just as consistent with what the detective said, and without any follow-up questioning. I mean, this was an answer that came out on cross-examination. It was one sentence. Everybody moved on. It wasn't picked back up on redirect to explain. It wasn't brought up in closing arguments. Don't we have Espinola's testimony here that was very strong? He was very adamant about the kind of gun that was pointed at him and his description of it. And he said it was absolutely not a BB gun. Well, no, he didn't say that. What he said about the gun that was pointed at him was that it was black, which matches the BB gun better. He does say that the gun that was found in his truck, which was the BB gun, was a different color from the one used. But then he's shown a photograph— He says it wasn't the same—the gun found in his vehicle was the BB gun. That's right. And he says it wasn't the same gun that I had seen before. It, the one I'd seen before, was a different color than the one—well, the BB gun was a different color than the one I was pointed with. He softens it, doesn't he? He softens it. He softens it and says it's black. Well, see, that's the thing is on the cross-examination, he's shown an actual photograph of the BB gun, and then he backtracks and he says he's not sure it had the same form. So, you know, what we have on direct examination is kind of based on his memory of months before, but when he's shown an actual photograph of it, he's not at all sure that it's the same thing. It's interesting to me, though, because there is a real clear difference in the colors of these guns. There is, but you have to remember that we have a side view of the gun. The victims did not. The gun was pointed at them, pointed down, and if you look at the front of the gun, the front of the real gun is dark brown. You don't see all the green and the different coloration on it, and the front of the BB gun is black. So, from the point of view of someone having it pointed at them, they actually do look fairly similar. You know, and just— Can I— I'm sorry. Please. I just want to—what do we do with cross-examination? Now, they say, okay, well, the examination on cross-examination, that was proper, and you say, yeah, that's right. We didn't challenge any of that. But then, at prong three, what do we do with it? Because you're saying that it was—you're not disputing the admissibility of it, and Detective Ward testifies on cross-examination. The question, and you would agree with me that Ms. Hughes is not a reliable and trustworthy person, answer, I would think in this instance she's trying to do the right thing. I would say she's giving truthful testimony. Right. And so, unless we just pretend that that didn't exist, in analyzing prong three, can we really say that saying basically a milder version of what was properly admitted on cross was erroneous under Jones and Charley? That had a substantial effect on the outcome. How can we say that? Right. So, the reason is, is because for harmless error analysis, it's a counterfactual. It's how the trial would have played out but for the error. If the prosecutor hadn't elicited this evidence— But we're not on harmless error. Well, under third prong. I'm sorry. Under third prong of prejudice. Substantial rights, which is what I understood your question being on to. Right. That's right. That's where it's your burden. Okay. Right. It's my burden. But my point is that the way that that's done is it's a counterfactual. You say, but for this error, how would it have played out? On direct. Huh? On direct. Let me finish because I don't think I'm being very clear. Sorry. I'm sorry. That's my fault. But my point is that if the prosecutor hadn't elicited the testimony that he believed, Ms. Hughes, then that cross-examination would have never happened. How do you know that? Because what he was trying to do was discredit the officer's belief in her testimony. So, you see this in other contexts under reasonable probability, harmless error kind of analysis, third prong type of analysis, where the court says, for example, the failure to elicit certain evidence wasn't prejudicial because if it had been elicited, the other side would have put on other evidence. But don't you always hear the same with Rule 609, evidence of prior conviction of a witness. You know, there's a motion in limine. It's denied. And so on direct examination, you try to remove the sting. And so you acknowledge the evidence of the prior conviction. And then on appeal, you say, well, the motion in limine was incorrectly decided. And don't we and every circuit court in the United States say, let's move. You elicited that. Well, I think this is a different. We can't just pretend that this didn't exist and think, OK, well, what would they have done? Would they have asked this question? Would they not have asked this question? I think that there's two different situations here. I think one of them is when the other side is capitalizing on the evidence, trying to use it in some way. That's not what was going on here. He was trying to completely discredit what the officer had said. So, I mean, this cross-examination was geared towards discrediting his belief in Hughes's statement. That cross never would have happened had it not been for the detective having testified that he believed it, because there would have been nothing to discredit. It would have still been, if he got a favorable answer, that would have been a heck of a good answer for him, because even if the detective Ward hadn't endorsed Hughes's credibility, Hughes's credibility, she still was a star witness for the prosecution. So that still would be a pretty good defense tactic to say, well, you would agree with me that the prosecution's star witness is a big, fat liar. Yeah, that's true. And, I mean, I'd point out, and I don't know exactly where this fits, to be totally honest, is that the question that he asked was just a character question that's permitted. The detective answered it in an impermissible way. Now, defense counsel didn't move to strike it or anything like that, but I think that if you look at this section of cross-examination as a whole, what he's trying to do is discredit the detective's belief in her testimony. The detective had said, I talked to Ms. Hughes. I believed what she said. So where he starts off is asking about confirmation bias and stuff like that. And doesn't that examination aid in curing any harm? I don't think it does because there's no indication that it was at all effective. I mean, he says, well, the question was something along the lines of, aren't you more likely to believe something that fits with your side of the story? And the detective says, no. And so that's why you said that you believed her and you followed her story and it was confirmed with other people's story. I mean, I think that's why the question was asked. I guess my point is that there's no reason to think it was effective in any way. I mean, the detective just flat out denies it. Defense counsel moved on. Well, but it plants the seed in the mind of the jury. Maybe. What do these law enforcement people do? They just hear what they want to hear. Well, I mean, he'd also told the jury that he'd been to interrogation school, that he was trained in doing these types of interrogations. I just don't know why we would assume that the jurors are going to be moved by that sort of cross-examination in light of the fact that this detective, you know, has this specialized training. I see that I'm out of time. Was there any discussion of the closing argument of this, of the credibility issue? In closing arguments? No, there wasn't. But I don't think that's very important because this was a very short trial. He was, Detective Ward was one of the last witnesses. He was certainly the last main witness. So I don't think that matters much one way or another. Thank you. Thank you. Did you have any follow-up? No. Thank you. Good morning, your honors. May it please the court, counsel, Joel Lynn McCormick on behalf of the United States. The court should affirm appellant's convictions on all counts for two reasons. First, just to dovetail into the discussion the court just had with counsel, the testimony of Detective Ward on direct examination did not constitute error. The trial court did not commit error by not striking Detective Ward's testimony. As the court has highlighted, the testimony of Detective Ward was limited in reference to whether or not the detective offered any opinion evidence, certainly not from an expert opinion, as to whether or not he believed either the appellant's account of the events that occurred or the co-conspirator, Ms. Hughes, who also testified at trial. When you look at the questions that were posed to Detective Ward on direct examination, it goes to, just as the court's questions highlighted, that he referenced basically that he was a who had been trained at the Reed School of Interrogation, and in our prior precedents, we've addressed that as an imprimatur on the expertise of the police officer. So, isn't that significant? It's not just like he was asking, well, you know, Bob Bagrag, did you think this person was credible? Did you, Detective Ward, who had attended this very impressive school of interrogation, did you believe Hughes? Yes, Your Honor, but when you look at the line of questioning in this case compared to what I believe the court is referring to as the Hill case, where the agent, Charlie Jones, testified in reference to his extensive training and how he was able to interpret various gestures and body language, and how he would interpret someone relying on their faith as a factor when weighing someone's credibility. That's certainly not what we have here, Your Honor. There was minimal discussion with Detective Ward in reference to his training and experience. There was some general discussion, but when comparing it to Hill, there is no comparison. And in reference to how Detective Ward applied that training and experience in his interpretation of what he was discovering through the course of his investigation, there is no comparison. Where in the Hill case, there was a step-by-step discussion as to what various responses meant to the detective, and then again, that discussion was highlighted in the government's closing argument. That's not what we have here. In reference to Detective Ward, his testimony touched on basically the fact that he was in the course of an investigation. I believe his words in his testimony was that the facts he was discovering in reference to which firearm was used or whether or not Ms. Hughes was providing information that was forthcoming. That was information that, and I believe he used the word, was corroborated by other facts. And so to the extent that he is a witness, a fact witness, who was involved in an ongoing investigation, it's not comparable to the testimony that this court found improper in Hill versus United States. In reference to the testimony concerning Moreno, again, we would ask the court to find that there is no error in the direct examination from Detective Ward in that regard as well. As the court has referenced, there was minimal direct testimony, and in reference to the specific testimony from Detective Ward in that regard, I believe his statement was that he found that the appellant had minimized the dangerousness of the events. And that did go to which firearm or whether or not an actual firearm was used or a BB gun. Does Rule 608 even apply in that instance, the colloquy that you just described? In the colloquy I just described, Your Honor, I believe Rule 608 does not apply. Because? Because? Because, Your Honor, it's an instance where we have a witness. He doesn't elaborate on the believability. He simply is saying, using the word minimize. But the believability, the person that's the target of that statement was the defendant, and the defendant didn't testify. So does 608 even apply? Again, Your Honor, no, Your Honor, we believe 608 does not apply in that instance. And so in reference to both the discussion in reference to Hughes or Detective Ward's testimony concerning co-conspirator Hughes as well as the appellant, we'd ask the court to find that there is no error and certainly not plain error in that regard. If the court does find error in this instance and we go on to an analysis as to whether or not this appellant's substantial rights were affected, we'd ask the court to find that based on the totality of the evidence before this jury. If we look at the balance of the evidence, if Detective Ward's testimony is stricken, the jury would have ended with the same result. How do we know that? And, Your Honor, because the record is replete with evidence where that supports this jury's findings of guilt on all counts. And let me ask it this way. Not as an argumentative question, but just so you know what my trepidation about what you just said is. It seems to me that this is just a very, very close swearing match. Was it this gun? You know, or early yoga or whatever his name is. Was it his gun that Hughes says? Or is it the Beebe gun? And there's no question that he had testified . . . I mean, that the star witness had acknowledged, at least in the initial interview, that the defendant had always carried that Beebe gun. He says he pulled that Beebe gun out of his pocket and that's what was used in both of the robberies. And then the woman says, no, it was this other gun. And as Judge Moritz was alluding to, well, the Beebe gun is an Espinosa's vehicle and it was in this third party's . . . the other gun was in this third party's vehicle. Well, it's just a complete swearing match. It all boils down, if I'm on a jury, I would . . . you know, the tiebreaker is what that woman said. Well, Your Honor, I believe it's important to look at all of the facts. And it doesn't really boil down to just a swearing match. Because in this instance, we have a very tight and important timeline on when the physical evidence was located in C. So the last carjacking was committed morning of approximately 9.30 a.m. The getaway car, the blue SUV, is seen leaving the apartment complex where the second victim had been encountered by the perpetrators. It's within hours. It's on the same day as the carjackings when Mr. Eraliga was arrested, driving the blue SUV, the getaway car, where the blue bandana that had been worn by co-conspirator Hughes is found in the getaway car with the firearm that had been used in the two carjackings. Why does that trump Espinosa's finding of the BB gun in his vehicle? It trumps, Your Honor, because when you're looking at all of the evidence again, we know from the testimony, not just the swearing match, but from the testimony of the two victims and from co-conspirator Hughes, that the vehicles that were taken from the two victims were used throughout the course of that and the rest of that day and the following day to go from location to location, stealing mail, stealing anything they could get their hands on in order to continue the crime spree. So those cars were in possession of the appellant and co-conspirator Hughes, using those cars as they wish, going in and out. We know that also from the items that were found in the stolen vehicles and the materials that were found in the getaway car. One of those cars was found with the BB gun in it. Exactly. How does that support the government's position? That goes to the fact that Ms. Hughes, co-conspirator Hughes, and the appellant had been using those vehicles throughout the— Both vehicles. Yes, Your Honor. Yeah, which, I mean, it's a very confusing scenario that you presented to the jury, and I struggle to see why this doesn't come down to Detective Ward's statement. And I'd like you to address your argument in the brief that you made about Hughes' statements in particular. I believe you indicated that somehow this went to her general— that Detective Ward's statements went to her general reputation for character, truthfulness, rather than to her truthfulness on a particular occasion. How could that possibly be? All he was talking about was her truthfulness at the Rule 11 proper, her truthfulness when he interviewed her. I don't know how you could argue that he was somehow talking about something else, some general reputation. Because he never, Your Honor, offers a specific statement that he is talking about her believability. He never uses the word— He's talking about her believability when he interviewed her on a particular occasion about a particular subject, which was the subject of this trial, what gun was being used. That's pretty specific. It's specific, Your Honor, in terms of how he is investigating this particular crime and how it's evolving. And yes, when he's talking about in terms of her initial interview and what was discussed at the Rule 11, there's certainly an inference that can be drawn by the jury that there was an evolution as to how much more information was gathered between those two settings. However, again, unlike the testimony in Hill, this is not an instance where this particular witness offered a firm opinion as to whether or not he believed this particular witness. Does it matter if the BB gun was used or the 9mm? When you look at the instruction given to the jury, it's an intent to cause bodily harm. Your Honor, the government's position is that it does not matter. In reference to the BB gun, and I believe there was some questioning in this regard, on cross-examination in particular, in reference to the dangerousness of a BB gun. So in that regard, Your Honor, I don't think that it matters in reference to whether or not the 9mm or the BB gun was used. So doesn't that resolve this whole debate about who do you believe in the vouching issue? I believe it does. It does relieve some of the pressure. Since I think we're at plain error, is that right? We are, Your Honor. We are at plain error. But I want to use just a few minutes to clarify. The facts of this case were not as confusing or muddled as one would think from the transcript. You have victim number one who describes the blue SUV, and he describes the gun that was pointed at him and that the woman was wearing a face covering. You have victim number two who describes, again, the blue SUV and the perpetrators. And in his trial testimony, he actually gestures, he says that it's the type of gun where it slides back. The transcript indicates that. He is indicating it's the same type of motion that one would use with a 9mm. That's the real gun. Yes, Your Honor. I'm sorry when I'm referencing victim one and two. Yes, Mr. Espinoza. Again, in reference to Ms. That's important because Ms. Hughes describes, I wore a face covering during these carjackings. The fact that her face covering is found in the same location with the 9mm gun is glaring. And that makes this case a lot different from the authorities that are relied on, even the Jones case that's relied upon by the appellant in this case. I'm sorry, but you've got Mr. Espinoza right after he says what you just repeated. He says, I don't know if the BB gun that was found in my vehicle was the same one, but I'm saying it was a black one. I mean, he's all over the place. And that's not unusual for somebody in that scenario under that kind of pressure. And I'm just saying, his own testimony was not consistent. He struggled. There's a language barrier there. He struggled, but if you look at the end of the day, he rests with, it's not the gun that he found in his truck. And it's a gun which he described as a brownish, he describes it as a multicolored gun. Or dark green. Yeah, dark green. Yes, Your Honor. The BB gun does have a component of dark green, doesn't it? The BB gun is black, Your Honor. I thought it was multicolored. The 9mm gun. Okay. The 9mm gun is multicolored, which those characteristics that he's describing are more consistent with the 9mm gun. Okay. Your Honor, I see my time is up. If there are no additional questions, we ask that the court affirm on all counts. Okay, thank you. Okay. It was very well presented, by the way, in your briefs and in your arguments today. Thank you, counsel, for both sides. It's been resubmitted.